**Richard F. CARELLA, Plaintiff,**

v.

**STARLIGHT ARCHERY, and Pro Line Company, Defendants.**

**Civ. A. No. 81–30037.**

United States District Court,
E.D. Michigan, S.D.

Sept. 27, 1984.

---

James A. Kushman and Ernie L. Brooks, Southfield, Mich., for plaintiff.

Randall G. Litton and Thomas M. McKinley, Grand Rapids, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

Plaintiff brought this action claiming an infringement of U.S. Patent No. 3,365,800. Defendant Pro Line counterclaimed seeking a declaration of patent invalidity and noninfringement. Defendant Pro Line also counterclaimed for damages and injunctive relief, asserting that plaintiff had engaged in patent misuse, unfair competition, and antitrust violations. In an opinion dated February 4, 1982, the Court ordered two separate trials in this case, with the first trial to address the questions of patent validity and infringement, and the second trial to resolve the issues of patent misuse, unfair competition, and antitrust violations. The Court then halted all discovery related to the issues of patent misuse, unfair competition, and antitrust violations until the Court decided the issues of patent validity and infringement.

Commencing on June 1, 1983, the Court conducted four days of hearings on the questions of patent validity and infringement. The Court heard final arguments on these two issues on January 26, 1984. The Court has reviewed the entire record along with the briefs and proposed Findings of Fact and Conclusions of Law submitted by counsel. Therefore, pursuant to F.R.Civ.P. 52(a), the Court hereby sets forth its Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

A. *Background of the Litigants*

1.) Plaintiff, Richard F. Carella, is an individual residing at 35572 Strathcona Drive, Mount Clemens, Michigan. Plaintiff does business at that address under the name of Range-O-Matic.

2.) At the time this suit was filed, defendant Starlight Archery was a proprietorship of Mr. Charles Nicholas, and was located at 21570 Groesbeck Highway, Warren, Michigan.

3.) Subsequent to the filing of this suit, Starlight Archery incorporated. Defendant Starlight Archery presently has four outlets, which are located in Warren, Royal Oak and Kalamazoo, Michigan; and Cleveland, Ohio.

4.) During the course of its operating history, defendant Starlight Archery has engaged in the business of retail sales of archery products. In addition, defendant Starlight Archery has continuously operated as a service center for archery equipment, as well as providing archery shooting lanes at its places of business.

5.) Defendant Starlight Archery is a customer of defendant Pro Line Company, and also has been a customer of plaintiff.

6.) Defendant Pro Line Company is a Michigan corporation having a principal place of business at 1675 Gun Lake Road, Hastings, Michigan. Pro Line Company is engaged in the business of the manufacture, distribution and sale of archery related products, including bow sights.

7.) This action was commenced on May 6, 1981, when Richard F. Carella filed a complaint against defendant Starlight Archery. The complaint alleged in a single count that Starlight Archery was infringing U.S. Patent No. 3,365,800 by selling a sight designated as Model M–525 RF and sight pins designated Model M–506 RF. Both of the allegedly infringing products are manufactured by defendant Pro Line Corporation.

B. *The Invention of the Carella Patent*

8.) The Carella Patent concerns a bow sight which provides for simultaneous range finding and aiming.

9.) The impetus for Corella's invention was his misfortune in bow hunting in 1965, when he missed a shot at a deer. As a result of this experience, plaintiff concluded that an archery sight combining range finding and aiming would be a helpful advance in the bow sight field.

10.) A significant step in the Carella patent occurred at an "archery shoot" on January 1, 1966, when Carella correlated the aperture defined by a sight pin hood with a circular target comparable in size to a deer's chest.

11.) Carella worked steadily on his sight, which would combine range-finding and aiming. His progress is reflected in the following exhibits: PX–4A, PX–4B, PX–4C, PX–4D, PX–4E, PX–4F, PX–4G, PX–11A, PX–11B, PX–11D, PX–11E, PX–11F, PX–11G, PX–11H, and PX–11I.

12.) Carella met with his patent attorney, Harold W. Milton, Jr. on September 24, 1966, to discuss applying for a patent.

13.) An application for a patent was filed August 7, 1967 in Carella's name, and the Carella Patent issued to him on January 30, 1968.

C. *The Claims of the Carella Patent*

14.) The following claims of the Carella Patent particularly point out and distinctly claim that invention:

1. An archery bow sight assembly comprising: support means adapted for attachment generally parallel to the length of an archery bow, and a plurality of independent sights respectively connected to and each independently adjustable longitudinally along said support means, each of said sights defining a longitudinal distance different from the longitudinal distance defined by any one of the other sights so that said assembly may be attached to an archery bow and each sight independently positioned relative to said support means for properly aiming the bow by moving the bow to view a target at a distance from the bow

through the respective sights until the apparent vertical height of the target equal the longitudinal distance defined by one of said sights, thereby properly aiming the bow for the particular target.

2. An archery bow sight assembly as set forth in claim 1 wherein at least two of said sights are disposed in overlapping relationship with one another.

3. An archery bow sight assembly as set forth in claim 1 wherein each of said sights includes a support shaft and means supported thereby and defining said vertical distance.

4. An archery bow sight assembly as set forth in claim 3 wherein said means defining said vertical distance presents an aperture having an endless periphery.

5. An archery bow sight assembly as set forth in claim 4 wherein said means defining said vertical distance comprises a circular ring with the ring of each respective sight being of a different diameter than the others.

6. An archery bow sight assembly as set forth in claim 5 wherein at least two of said rings are disposed in vertically overlapping relationship with one another.

7. An archery bow sight assembly as set forth in claim 6 wherein said sights are attached to said support means in a plurality of spaced vertical rows.

8. An archery bow sight assembly as set forth in claim 6 including adjustment means for allowing the adjustment of the vertical position of each support shaft relative to said support means.

9. An archery bow sight assembly as set forth in claim 8 wherein said adjustment means comprises threads on each support shaft with a pair of nuts threaded thereonto and clampingly engaging said support means.

10. An archery bow sight assembly as set forth in claim 9 wherein said support means comprises a bracket having two spaced vertical slots, said support shafts being disposed through one of said slots.

D. *The Operation of the Carella Patent*

15.) The operation of Carella's sight was described at trial, and is also described on the packages which contain Carella's patented Range-O-Matic sight. The physical principle underlying plaintiff's sight is that the further an object is away from the viewer, the smaller the object appears.

16.) Thus, in setting the Carella sight, one uses the same size target at each step of the process. Carella himself would use a 12 inch target that would approximate a deer's chest, but other size targets could also be used. The key step is to first "sight in" with the largest ring to fix your sight for close range, and then sight in each smaller ring to fix the sight for longer ranges. Four rings are necessary to make the sight useful for bow hunting.

17.) Because each ring is independently adjustable, and because the double slotted mount permits overlapping, the Carella sight can be used by any archer to obtain simultaneous range finding and aiming.

E. *The Scope and Content of the Prior Art*

18.) At trial, Carella introduced sixty-six patents relating to archery bow sights generally, many of which relate to range finding bow sights specifically.

19.) The art relevant to the Carella Patent is a crowded art, where narrow advances are granted patent protection. Nevertheless, it is incumbent on the Court to review the prior art cited by the examiner, and the uncited art produced by the defendants as a challenge to the validity of the Carella Patent.

i. *The Cited Art*

20.) The examiner cited three patents during the prosecution of the Carella Patent: U.S. Patent No. 2,574,599 (hereinafter called the "Steiber Patent"); U.S. Patent No. 2,991,556 (hereinafter called the "Wilchek Patent"); and U.S. Patent No. 3,120,-222 (hereinafter called the "Bear Patent").

21.) The Stieber Patent discloses several embodiments of a range finder gauge for

use on a bow. Each of the embodiments includes a rigid plate which is affixed to the bow and is adjustable vertically or longitudinally on the bow. In one embodiment, the plate defines a plurality of vertically spaced sighting slots, with each of the slots having a different vertical height. However, the individual slots are not independently adjustable with respect to one another.

22.) The Wilchek Patent discloses a sight assembly including a bracket, and a plurality of independently adjustable and vertically or longitudinally movable sight pins. The sight pins are what archers term "standard beaded sights." These sight pins do not include circular rings. The sight pins are independently adjustable with respect to each other on the bracket to permit them to be "sighted in" at different distances from a target. How this "sighting in" may be done is discussed at Finding of Fact No. 39.

23.) The Bear Patent discloses a sight assembly in combination with a bow. The sight assembly has a single sight, which is mounted in a vertically slotted bracket so that the archer may adjust it.

ii. *The Uncited Art*

24.) The defendants contend that the plaintiff failed to disclose to the Patent and Trademark Office certain critical prior art references. Specifically, defendants place great reliance on U.S. Patent No. 3,056,206 (hereinafter the Moore Patent); U.S. Patent No. 2,332,080 (hereinafter the Howe Patent); the "Adjusta" sight; the "Vee" sight; and the Schneider Rite-Flite sight.

25.) The Moore Patent discloses a bow sight in which two independently adjustable rings of different sizes are mounted on a slot. The articulated purpose of the Moore sight is to allow an archer to use the sight for both field and target anchors, and to provide for the adjustment of sights when bow strings are replaced, arrows of differing weights are used, or when other circumstances arise, such as those described in DX-U. There is no express teaching in the Moore Patent concerning range finding. Moreover, the Moore Patent was never commercially developed, and is thus a paper patent.

26.) The Court has also examined the file wrapper of the Perkins Patent (DX-Q). The Court finds that the patent examiner in Perkins did not read the Moore Patent as teaching range finding when he rejected Perkins' claims.

27.) The use of the Moore sight as a range finding mechanism depends on hindsight developed in light of the teachings of the Carella Patent.

28.) The Howe Patent discloses the concept of multiple spaced rows of sights. The sights used in Howe are pin sights, and the language of the patent teaches that the pins "are given distinguishing colors to represent different ranges." The stated shooting procedure for the Howe sight requires the archer to estimate the distance to the target, and then sight along appropriate pin. (PX-G).

29.) The Adjusta-Sight (DX-BZ) uses the same physical principle as the Carella sight, but its structure is entirely different. Furthermore, it does not provide a capacity to aim and rangefind simultaneously. Rather, the archer is required to adjust the aptly named Adjusta-Sight.

30.) Like the Adjusta-Sight, the Vee-Sight uses the same physical principle as the Carella Patent, but uses a different structure, and does not provide for simultaneous range finding and aiming.

31.) On August 5, 1968, David J. Perkins instituted a declaratory judgment action in the Eastern District of Michigan, seeking a declaration that the Carella Patent, U.S. Patent No. 3,365,800 was invalid. *Perkins v. Carella*, Civil No. 31581 (E.D.Mich., Aug. 5, 1968).

32.) The lawsuit of *Perkins v. Carella* was ultimately settled, but during the course of the discovery proceedings the parties took the deposition of a Mr. Burnett Schneider, the developer of the Rite-Flite bow sight.

33.) At the trial of the instant case, the Court admitted the deposition of Mr. Schneider taken during the *Perkins v. Carella* proceedings. The Court admitted this deposition pursuant to F.R.Civ.P. 32(a)(3)(D), and F.R.E. 804(b)(1).

34.) Although the Court admitted Mr. Schneider's deposition into evidence, the Court still has the responsibility to assess the credibility of Schneider's testimony. Having reviewed the deposition, the Court is struck by Schneider's unclear testimony concerning the development of the Rite-Flite sight. Specifically, the Court notes the contradictions between the time claimed for the development of the physical models of the Rite-Flite sight, and the dates which appear on sketches and drawings. In sum, the Court finds only three relevant facts established by the Schneider deposition. First, an advertisement for the Rite-Flite sight appeared in a Wisconsin Bow Hunter Association mailer that was mailed on August 17, 1966. No evidence was produced showing when that mailer was received by the public. Second, Mr. Schneider began to sell to the public his Rite-Flite sight after the mailing. Third, an advertisement for the Rite-Flite sight appeared in the July/August, 1967 issue of *Bow & Arrow Magazine.*

F. *The Differences Between the Carella Patent and the Prior Art*

35.) The use of apparent vertical height for rangefinding was well known in prior art (the Stieber Patent), as was the use of multiple elements on a sight (the Wilchek Patent and the Moore Patent), and the use of circular hoods (the Bear Patent and the Moore Patent).

36.) The prior art, however, lacked any teaching or suggestion of the use of circular apertures for simultaneous range finding and aiming; a teaching which eliminates all the shifts required of an archer when using the separate range finding gauges and aiming sights taught by the prior art.

37.) Accordingly, the differences between the Carella Patent and the prior art are:

(a) The broad concept of simultaneous range finding and aiming taught by the Carella Patent was unknown to the prior art.

(b) The specific implementation of Carella's concept through thin rings adjustable to overlap for maximum effectiveness was neither appreciated nor disclosed.

(c) The use of a double slotted sight bracket to enhance overlap as claimed in the Carella Patent was also never appreciated or disclosed.

G. *The Level of Ordinary Skill in the Art*

38.) The ordinary level of skill in the relevant art is low, for the designers of archery sights usually do not have advanced degrees or formal technical training. Rather, the designers of archery sights are generally practicing archers, who have only a high school education.

39.) It was within the ordinary level of skill in the relevant art to use a pin sight to gauge distance. Specifically, the archer used the open space between two pins to gauge distance, and then put the relevant pin on the bullseye. This method of using pin sights does not have the feature of the Carella sight, which provides for simultaneous range finding and aiming.

H. *The Development of the Pro Line Sight*

40.) In 1973, defendant Pro Line approached Carella for a license to produce the Patented Range-O-Matic sight. This initiative was rejected by Carella.

41.) Defendant Pro Line renewed its initiative with Carella after Mr. Ploot joined Pro Line in 1978. Again, Carella refused to license Pro Line.

42.) Defendant Pro Line sought advice from patent counsel in 1978 and in 1980 on the validity of the Carella Patent.

43.) Notwithstanding nearly a decade of deference to the Carella Patent, and the

absence of any competitive range finder from Pro Line's catalog, Pro Line copied the Carella sight and introduced that product copy in 1981.

44.) The evidence supporting this finding of copying consists of the testimony in Mr. Ploot's deposition, the similar structure of the Pro Line product, and the similar claims used in advertising the Pro Line product.

### I. *Defendants' Infringement of the Pro Line Patent*

#### i. *The M–525 RF Range Finder Hunting Sight*

■ 45.) Pro Line manufactures and sells the M–525 RF range finder hunting sight.

46.) Starlight sells the M–525 RF range finder hunting sight.

47.) Richard Carella and Theodore Brooks both testified that Claims 1 through 6 of the Carella Patent read directly on the M–525 RF range finder hunting sight.

48.) Richard Carella and Theodore Brooks further testified that the M–525 RF range finder hunting sight and Carella's commercial embodiment of the invention of the Carella Patent perform the same sighting and range finding functions in the same way, when used by the hunter in the field.

49.) The M–525 RF range finder hunting sight infringes the Carella Patent both literally and under the Doctrine of Equivalence.

#### ii. *The M–506 RF Range Finder Pins*

50.) The Court finds the M–506 Range Finder pins can be used in the permissible repair of the range finding sight, and are also suitable for non-infringing uses. Thus, these pins do not infringe on the Carella Patent.

### J. *Damages or Attorney Fees*

51.) Richard Carella and Dorothy Carella testified that the minimum profit made on the sale by Carella of his complete range

finding bow sight assembly is Seven Dollars ($7.00).

52.) Defendants submitted evidence at trial of a number of devices which may be utilized to gauge the range of the target from the archer, but defendants did not provide any evidence of commercially available devices which combine the range finding and aiming functions in a single element for instantaneous shooting as do the Carella and Pro Line range finding hunting sights.

53.) Carella testified that his sight is unique, and Pro Line found no substitute for its catalog from the time of its initial interest in 1973 until it offered a copy in 1981.

54.) Since there are no non-infringing, commercially available substitutes for the Carella range finding bow sight, purchasers of the Pro Line M–525 RF hunting sight would have purchased Carella's range finding bow sight had the Pro Line range finding hunting sight been unavailable.

55.) The number of M–525 RF range finder hunting sights sold by Pro Line and the corresponding lost profit to Carella as a result of those sales as of the time of trial are as follows:

| Year | Unit Sales | Lost Profits |
|------|-----------|--------------|
| 1981 | 4,576 | $ 32,032.00 |
| 1982 | 3,422 | 23,954.00 |
| 1983 | 640 | 4,480.00 |
| | Total | $ 60,466.00 |

56.) The Court finds that the defendants had a reasonable doubt as to whether the Carella Patent was valid. Thus, defendants did not willfully infringe on that patent, even though they copied the Carella bow sight.

### CONCLUSIONS OF LAW

1.) The defendants raise several contentions which dictate the issues in this case. In particular, the defendants claim that the Carella Patent is invalid because it was anticipated by the prior art, it was obvious, and the subject matter was in public use or for sale for more than one year before the patent application was filed. The defend-

**620**

ants also contend that the Carella Patent is unenforceable because of the plaintiff's failure to cite certain relevant prior art to the patent office, and to file a copy of the settlement in the *Perkins v. Carella* lawsuit. Finally, the defendants argue that even if the patent is enforceable, defendants did not infringe on the patent, and if they did infringe, treble damages and attorney fees are not warranted.

2.) Before addressing each of defendants' contentions, the Court will discuss the burden of proof in this case and the presumption of patent validity. After establishing the guidelines governing the burden of proof, the Court will dispose of defendants' contentions.

A. *Burden of Proof and the Presumption of Validity*

■ 3.) The statutory presumption of patent validity imposes the burden of persuasion on one who attacks the validity of a patent. 35 U.S.C. § 282.

4.) In the Sixth Circuit Court of Appeals, the rule was that this presumption may be weakened or wholly vitiated if the Patent Office failed to consider all pertinent art. *American Seating Co. v. National Seating Co.*, 586 F.2d 611 (6th Cir.1978).

5.) The Court of Appeals for the Federal Circuit has rejected the Sixth Circuit's approach, for the Federal Circuit has held that the burden of persuasion of invalidity must, under the statute, remain at all times on the party asserting invalidity, although that burden may be carried more easily by evidence consisting of more pertinent prior art than that considered by the examiner. *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440 (Fed.Cir.1984); *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350 (Fed.Cir.1984). Further, the facts establishing anticipation or obviousness must be proven by clear and convincing evidence. *RCA Corp. v. Applied Digital Data Systems, Inc., supra; Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506 (Fed.Cir.1984).

B. *Anticipation*

6.) Although anticipation is a factual determination, the Court articulates its ruling at this point in the opinion because a statement of the proper standard is necessary before ruling.

■ 7.) Anticipation requires the presence in a single prior art reference disclosure of each and every element of the claimed invention arranged as in the claim. *Lindemann Maschinenfabrik v. American Hoist and Derrick*, 730 F.2d 1452 (Fed.Cir.1984).

8.) Finding of Fact 14 sets forth the claims of the Carella Patent. A comparison of these claims with the prior art discussed in Section E of the Findings of Fact leads the Court to conclude that the Carella Patent was not anticipated, since no prior art reference discloses each and every element of the claimed invention.

C. *Obviousness*

9.) The test for obviousness has been well established since *Graham v. John Deere*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965), where the Supreme Court stated:

While the ultimate question of patent validity is one of law, *A & P Tea Co. v. Supermarket Corp., supra*, 340 U.S. [147], at 155 [71 S.Ct. 127 at 131], 95 L.Ed. [162] at 168, the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of

obviousness or nonobviousness, these inquiries may have relevancy.

*Id.* at 17–18, 86 S.Ct. at 694.

10.) The Court has made the factual determinations directed by the *Graham* decision and finds that the Carella Patent is not invalid due to obviousness. Of particular significance to this decision is the low level of ordinary skill in the pertinent art, and the simultaneous range finding and aiming which is provided only by the Carella Patent. In addition, the Court believes that the decision of defendant Pro Line to copy the Carella sight, and not any other, shows how the Carella sight has met a long felt need.

### D. *Prior Public Use or Sale*

■ 11.) An inventor is not entitled to a patent if the invention was in public use or on sale in this country more than one year prior to the date of the application for patent in the United States. 35 U.S.C. § 102(b).

12.) As reflected in Finding of Fact 13, plaintiff filed for the instant patent on August 7, 1967. The critical dates for comparison are those involving the Schneider Rite-Flite sight. The contradictions in the Schneider deposition lead the Court to mistrust much of the information provided by Schneider, and the Court, therefore, found only limited facts established by that deposition. None of the facts set forth in Finding of Fact 34 make the Carella Patent invalid, especially when the rule is that a magazine takes effect as a printed publication under 35 U.S.C. 102 as of the date it reaches the addressee. *Protein Foundation Inc. v. Brenner,* 260 F.Supp. 519 (D.C. D.C.1966). The defendants offered no proof as to the date the Wisconsin Bow Hunters Association magazine reached its various addressees, and 35 U.S.C. § 102(b) will not invalidate the patent.

### E. *Defendants' Allegations of Fraud*

13.) Defendants argue that the plaintiff worked a fraud on the patent office because plaintiff breached his duty of candor to the Patent and Trademark Office, and because plaintiff did not file a copy of the settlement in the *Perkins v. Carella* lawsuit.

■ 14.) Although a patent applicant has an "uncompromising duty" to disclose material prior art during the prosecution stage before the patent office, the failure to disclose prior art will not result in an unenforceable patent unless unclean hands or fraud are shown by "clear, unequivocal, and convincing" evidence. *Schnadig Corp. v. Gaines Manufacturing Co. Inc.,* 494 F.2d 383 (6th Cir.1974). The Court's Findings of Fact concerning both the disclosed and undisclosed prior art show that the undisclosed art adds little to what was considered by the Patent Office. Thus, the Court finds no fraud or unclean hands on this basis.

■ 15.) Defendants' other fraud theory is that the patent-in-suit is void and unenforceable because of the settlement in the *Perkins v. Carella* lawsuit. Defendants' argument is based on an analogy to 35 U.S.C. § 135(c). 35 U.S.C. § 135(c) provides in essence that if there is an agreement between parties to an interference, and that agreement works to terminate the interference, then a true copy of that agreement is to be filed in the Patent Office. Failure to file the true copy will render the agreement unenforceable, as well as rendering unenforceable any patent of the parties involved in the interference. The terms of 35 U.S.C. § 135(c) limit that section to patent interferences, and thus it would be inapplicable to the private settlement of a lawsuit, such as the suit in *Perkins v. Carella.* The Court will not hold plaintiff's patent void on this failure to file theory.

### F. *Infringement and Damages*

16.) As detailed in the Findings of Fact, the Court found that defendants infringed on the Carella Patent by manufacturing and selling the M–525 RF sight, but there was no infringement in the manufacture and sale of the M–506 RF range finder pins.

17.) The Court computed damages on the basis of lost profits because given the nature of the market for plaintiff's archery sight, this method of computing damages furthers the purposes of the patent laws. *Lam, Inc. v. Johns-Manville Corporation,* 718 F.2d 1056 (Fed.Cir.1983).

18.) The Court did not award treble damages or attorney fees because the Court found that although there was copying, it was not done in bad faith, but rather was done as the basis of a reasonable belief in the invalidity of the Carella Patent. See generally, *Lam, Inc. v. Johns-Manville Corp.,* 668 F.2d 462 (10th Cir.1982), *cert. denied,* 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982).

*Conclusion*

19.) For the reasons stated above, the Court holds that defendants infringed on the Carella Patent, U.S. Patent No. 3,365,-800, and are liable for damages in the amount of $60,466.00. Because this case involves several unresolved counterclaims, the Court cannot automatically enter judgment. F.R.Civ.P. 54(b). The parties have ten days from the date of this order to submit memorandum on whether the Court should enter judgment at this time. The parties should also submit proposed judgments along with their respective memorandum.

IT IS SO ORDERED.