YARWAY CORPORATION, Appellee,

v.

EUR–CONTROL USA, INC., and Eur-Control Kalle, A.B., Appellants.

Appeal No. 85–739.

United States Court of Appeals, Federal Circuit.

Oct. 3, 1985.

William K. West, Jr., argued, Cushman, Darby & Cushman, Washington, D.C., for appellants. With him on briefs were Sherman O. Parrett and James T. Hosmer.

Trammell E. Vickery and J. Allen Maines, Hansell & Post, Atlanta, Ga., of counsel.

John W. Logan, Jr., argued, Ferrill & Logan, Fort Washington, Pa., for appellee. With him on brief was Thomas M. Ferrill, Jr.

Before BENNETT, Circuit Judge, NICHOLS, Senior Circuit Judge, and NIES, Circuit Judge.

NICHOLS, Senior Circuit Judge.

This is an appeal from the judgment of the United States District Court for the Northern District of Georgia, Shoob, J. presiding, holding that Eur-Control USA, Inc. (Eur-Control) infringed United States Patent No. 3,524,592 (the '592 patent), and that Eur-Control Kalle, A.B. (Kalle) induced infringement. The validity of the patent was not questioned. The court further held that damages should be calculated based on Yarway's lost profits, and that Eur-Con-

trol and Kalle had acted in bad faith. Thus the court enhanced damages by one-half, in accordance with 35 U.S.C. § 284, and allowed recovery of attorney's fees under the "exceptional case" provision, 35 U.S.C. § 285.

This court has jurisdiction pursuant to 28 U.S.C. § 1295. We affirm the judgment on infringement and the lost profits award, and reverse the enhancement of damages and attorney's fees award. We also vacate and remand the court's judgment dismissing Kalle's breach of contract counterclaim, but affirm the judgment dismissing the Lanham Act and Georgia Deceptive Trade Practices Act counterclaims.

## Background

### A. The Relationship of the Parties

The relationship of the parties to this case is somewhat complex and bears a brief explanation here. Appellant Eur-Control is a Georgia corporation engaged in the manufacture and sale of equipment used in the power generating industry, including items known as "desuperheaters" which are the subject of the '592 patent, and which are used to cool superheated steam in conduits. Kalle is a Swedish company also involved in the manufacture of desuperheating equipment. Both Eur-Control and Kalle are owned or controlled by a common parent and thus Eur-Control is neither a wholly-owned subsidiary nor independent of Kalle.

In 1970, the '592 patent, entitled "Device for Introducing Cooling Water Into a Conduit for Superheated Steam," was issued to *defendant-appellant Kalle* as assignee of the inventor Gustafsson. During the pendency of the '592 application, Kalle entered into a contract with Yarway, the provisions of which are relevant here. Kalle gave Yarway, subject to certain narrow exceptions not pertinent here, the exclusive right to manufacture, use, sell and distribute throughout the United States a desuperheater component described in the contract as the "Nozzle," covered by the '592 application, as well as any modifications or improvements thereon. Yarway in turn

agreed to pay Kalle a royalty for each Nozzle it manufactured at a rate of 8 percent of the price at which Yarway could have purchased the product from Kalle. In practice Yarway instead generally purchased the Nozzles from Kalle for resale in the United States as provided by the contract terms. This device is sometimes called in the record the "DA-4" and is widely sold by Kalle outside the United States. The contract also provides that Yarway shall "inscribe upon all Nozzles a reference to the applicable patent number" as well as the phrase "produced under license from [Eur-Control]." By the terms of the contract, either party could terminate the agreement if the other breached any of its terms "and fails to remedy such breach within ninety (90) days after receipt of written notice to do so."

In 1980 Eur-Control began marketing a Model DA-6 desuperheater in the United States in competition with Yarway; in 1981 Eur-Control continued to compete by marketing a newly designed DA-8 Model. Yarway, claiming the DA-6 and DA-8 desuperheaters infringe the '592 patent, thereafter commenced suit charging Eur-Control with infringement and Kalle with inducement of that infringement. In so doing, Yarway, the licensee, placed itself in the unusual, but not extraordinary, position of claiming the United States patent owner was infringing its own patent.

### B. The Patent

The '592 patent discloses a cylindrical device with a conical nozzle at one end and a plurality of passages through the cylinder wall. The device, a desuperheater, is basically a valve which provides for a controlled flow of a cooling medium, here water, into superheated steam. The water is incorporated into the superheated steam, absorbs heat, and thereby reduces the steam temperature.

The patent includes three claims. Claim 1 is illustrative.

1. A device for introducing a controlled amount of cooling water into a conduit for superheated steam, comprising a cylinder having a conical nozzle at

one end, a plurality of velocity nozzles provided through the cylinder wall to connect the interior of the cylinder to a source of high pressure water located outside of said cylinder, said velocity nozzles being spaced axially and directed substantially tangentially to the cylindrical inner surface of said cylinder, a piston movable to said cylinder to progressively expose said velocity nozzles when moved backwards from a position closing said conical nozzle, said piston having a piston rod connected thereto extending through the rear end of said cylinder connected to an actuating member, the swirling water from said tangential velocity nozzles passing directly through said cylinder and conical nozzle into said steam.

Also relevant to our review is Claim 3.

3. A device as claimed in claim 1 wherein each of said velocity nozzles has a relatively wide inlet portion at the outside of said cylinder and a restricted outlet at the inside of said cylinder.

Fig.1

Fig.2

As described with reference to the patent's Figures 1 and 2, a jacket 8 surrounds a cylinder 4 containing a conical nozzle 6. An annular space 7 comprises a reservoir for high pressure steam. A piston 11 is able to move backwardly within the cylinder from the conical nozzle to expose a plurality of "velocity nozzles" 15 which are axially and radially disposed in the cylinder wall. When functioning in response to a demand for desuperheating water, the piston is withdrawn to uncover one or more of the "velocity nozzles;" swirling water then enters, flows on the inner walls of the chambers, and forms a conical curtain of water droplets that evaporate into the steam.

It is a point with this design, though not claimed, that the coolant water does not strike the cylinder wall and thus avoids eroding it. The DA–6 and 8 differ in that the velocity nozzles are not conical in section or as described in claim 3, and are not directed quite so "tangentially" though apparently somewhat at a tangent.

C. *The Prosecution History*

Of course, as the district court was faced with an infringement action, construction of the claims was necessary, and thus the prosecution history of the patent was and is relevant. The original '592 application, which contained one independent and two dependent claims, was rejected under 35 U.S.C. § 103 in view of the prior art.

Thereafter, applicant cancelled the claims and added a new set of three claims, with the new independent claim substantially similar to the original claim 1 except that the term "passages" was changed to "ports." The examiner then issued a final rejection, finding the claims unpatentable under § 103.

The record shows that following the final rejection the inventor, Gustafsson, appearing *pro se*, participated in an examiner's interview which resulted in an examiner's amendment. Although it is unnecessary to discuss the amendment changes in detail, we note that the examiner added text to the specification concerning the "swirl action" of the water and introduced the term "velocity nozzle" to both the claims and specification, replacing the term "port." We note also that the record provides no evidence from either participant to the examiner's interview regarding the rationale for these changes or for the allowance of the claims. Appellants attached to a motion to reopen the record, or for new findings, an affidavit of the inventor, but the district court properly determined that appellants had not established good cause to reopen. As this affidavit was never admitted as evidence, this court cannot consider it as proof of anything. In any case, it tells what the inventor said to the examiner, not what the examiner thought, which he wisely left to be determined from what he wrote and did. While it seems to say a velocity nozzle of other than the claim 3 configuration would be useless, the affiant's actual acquaintance with the performance of the DA–6 and 8 is not shown and inferentially was nonexistent.

### D. *District Court Proceedings*

The district court rendered an initial judgment following four days of trial and oral argument. In its findings of fact and conclusions of law, the court found that the devices sold by Eur-Control "consist of a combination of elements which, as to their size, function, general shape, manner of cooperation and purpose, correspond to the parts of the desuperheater described in the '592 patent and called for by claims 1 and 2 thereof, and the combination of such parts performs the same function in substantially the same manner to accomplish the same result" as described by the '592 patent. The court also found that as a result of Eur-Control's competition using the infringing devices, Yarway found it "virtually impossible to sell the DA–4 desuperheater [purchased under the contract] within the United States because of the considerable price advantage Eur-Control USA had for its products over the products which Yarway purchased from [Kalle] for resale." Further, the court found that the products at issue filled a "special niche" in the market so that each sale of an infringing device prevented a sale by Yarway; the court therefore calculated Yarway's lost profits based on 100 percent lost sales, reduced by 15 percent "to reflect sales made by Eur-Control to customers either unknown or inaccessible to Yarway."

With regard to bad faith, the court found that the infringement was a "deliberate attempt to circumvent the Yarway license agreement." The court then concluded that there existed willful infringement and held that "in view of the willful infringement by [appellants], and the deliberate attempt to improperly circumvent the license agreement," the damage award was to be multiplied by one and one-half. Finally, the court held "[t]his is an exceptional case within the meaning of 35 U.S.C. § 285" and awarded attorney's fees.

Subsequently, in response to appellants' motion, the court amended certain aspects of its initial judgment. As relevant to this appeal, the court refused to change its finding on infringement, but recognized the existence of differences in structure and performance between the '592 patent and the accused devices. The trial judge stated, however, that he "remained convinced that the [accused] desuperheaters perform the same function in *substantially* the same manner as the desuperheater specified in the '592 patent." The court also amended its initial judgment to reflect its conclusion that the infringement was *not* willful, but the result of bad faith efforts

to circumvent the Yarway license agreement. Enhancement of damages, based on 35 U.S.C. § 284, was therefore premised solely on this bad faith.

### Jurisdiction

■ Although the parties have not questioned it here, this court must always consider its jurisdiction. We conclude this court has jurisdiction as this case arises under 28 U.S.C. § 1338(a), although the parties' relationship, that of licensor to licensee, is based upon a contract. (The contract actually was between Kalle and Yarway, as Eur-Control did not exist at the time of the agreement. It is not clear whether the district court ever considered the contractual relationship of Eur-Control to Yarway as distinct from Kalle's relationship with the licensee. In the pleadings, however, Eur-Control alleged that it was not a third party to the contract, and accepting this premise, we will consider for jurisdictional purposes that Eur-Control's relationship to Yarway to be that of a licensor to a licensee. Neither party has argued the contrary on appeal.)

Both the Supreme Court and this circuit have had the opportunity to consider the jurisdictional premise of patent-related disputes between contracting parties, and we believe the law is clear. The fact that a patent dispute arises between contracting parties does not necessarily lead to the conclusion that the cause of action is one under contract rather than one arising under the patent laws. In *Littlefield v. Perry*, 88 U.S. (21 Wall) 205, 22 L.Ed. 577 (1874), the Court held that an infringement suit by a licensee against a patentee/infringer involves a suit arising under the patent laws and therefore presents a federal question. *Id.* 88 U.S. at 223. Similarly, in *Excelsior Wooden Pipe Co. v. Pacific Bridge Co.*, 185 U.S. 282, 291, 22 S.Ct. 681, 684, 46 L.Ed. 910 (1902) where, in determining whether a federal court had jurisdiction over a cause of action by a licensee alleging infringement by the licensor if the licensor alleged that the license had been abandoned, the Court recognized that a

licensee, just as any plaintiff, must set forth his title and therefore puts that title in issue. "The defendant is at liberty in such a case to deny the title of the plaintiff by declaring that the license no longer exists, but * * * this does not make it a suit upon the license or contract, but it still remains a suit for the infringement of a patent * * *." *Id.*

To determine the subject matter jurisdiction for a claim alleging patent infringement, "the court must consider as a whole the substance of the claim in addition to the language of a complaint, and may also consider jurisdictional facts outside the pleadings." *Air Products and Chemicals, Inc. v. Reichhold Chemicals, Inc.*, 755 F.2d 1559, 1561, 225 USPQ 121, 122 (Fed.Cir. 1985). "[W]here a non-frivolous complaint states a claim and seeks relief under the patent laws, exclusive jurisdiction in the federal courts is thereby established." *Id.* at 1564, 225 USPQ at 124. Here, the relevant record clearly indicates that Yarway seeks the relief afforded by the patent laws and available to a licensee under both statute and case law. As the substance of appellants' claim arises under the patent laws, the court has subject matter jurisdiction.

### Infringement

The district court found infringement in its initial decision; upon appellants' motion, the court reconsidered its judgment and remained convinced that the accused devices perform the same function in substantially the same manner as indicated in the patent, although the court agreed that there were some differences in structure and performance. We read the court's judgment, based on its explanation, to be a judgment of infringement based on the doctrine of equivalents. *See Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 900, 221 USPQ 669, 678 (Fed.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 187, 83 L.Ed.2d 120, 225 USPQ 792 (1984). Appellants attack the court's judgment as being premised upon an overbroad range of equivalents given the file wrapper of the

patent and upon incorrect claim construction. We conclude that there was no misapplication of the law of file wrapper estoppel or error of claim construction, and that the finding of infringement is not clearly erroneous. We affirm the judgment on infringement.

■ We need not dwell on the court's finding of infringement as the applicable doctrines have been set forth by this circuit in the past and the record fully supports the court's result. The district court was well aware of the basic rules concerning the doctrine of equivalents. To determine infringement based on equivalency, the court had to assess whether the *claimed* invention and the accused device, which does not literally infringe, perform substantially the same function in substantially the same way to give the same result. See *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). We note here that appellants have argued throughout that the court erred as it compared the accused devices to the commercial embodiment of the claimed invention. Although this would of course be error, *see Nestier Corp. v. Menasha Corp.-Lewisystems Division*, 739 F.2d 1576, 1579, 222 USPQ 747, 749 (Fed.Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985), appellants' argument is not supported by the record which contains much expert testimony comparing the *claims* to the accused devices. Such an argument cannot prevail.

The district court was also well aware of the doctrine of file wrapper estoppel, which prevents a patentee from capturing through the doctrine of equivalents that which he has surrendered to acquire his patent right. The file wrapper was explained to the trial court as it related to claim construction and the doctrine of equivalents. The court was particularly persuaded by the expert testimony of Mr. Clark. We note Mr. Clark is a patent lawyer, not an engineer. In the manner not unusual in patent cases, he testified about questions of patent law as if it were for-

eign law. The district court did not adopt his view as to literal infringement, and whatever weaknesses there may be in this position may not be imputed to the different view of the district court.

. Mr. Clark testified on the nature of the file wrapper and the limitations added to make the claims patentable over the prior art. We find Mr. Clark's explanation of the file wrapper to be much more consistent with an objective reading of the file wrapper than appellants'. Although the specification does mention a direct flow of water, we do not read the wrapper as limiting the claims to cover devices in which the water flows on the inner wall without ever touching the cylinder plug at all, or that the '592 application was granted because it provided thus for the reduction of erosion. If the invention as patented eliminates erosion, evidently any approach to the tangential configuration would have a favorable effect towards that end.

Appellants also argue that the district court erroneously construed the claims by accepting Mr. Clark's testimony on the doctrine of claim differentiation. Mr. Clark's explanation of the doctrine of claim differentiation corresponds with the definition accepted by this court in *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 770, 218 USPQ 781, 788 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687, 224 USPQ 520 (1984): "[w]here some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement." As set forth previously, claim 3 is a dependent claim that describes a velocity nozzle with a wide inlet and narrow outlet. Under the doctrine of claim differentiation, the narrow claim 3 merely precludes reading the broad claim 1 as limited to a velocity nozzle with a wide inlet and restricted outlet. The velocity nozzle in claim 1 is any nozzle that imparts velocity to substances flowing through it. One seeking to produce an equivalent might obtain velocity in a variety of ways. Our acceptance that, because of the file wrapper, an outlet port other

than a velocity nozzle cannot be deemed an "equivalent," does not constrict our choice of equivalents very much. The common garden hose illustrates that any narrow outlet to a broader conduit will add some velocity to a liquid passing through the conduit. The district court could and evidently did properly infer that the uniform diameter outlets of the DA–6 and 8 models added enough velocity to achieve the purposes of those desuperheaters.

■ The doctrine of equivalents was established to make it impossible for "the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Graver Tank & Manufacturing Co.*, 339 U.S. at 607, 70 S.Ct. at 856. Particularly revealing in this case is the testimony of Mr. Schoonover, a former employee of Eur-Control involved in the designing of the DA–8 sold by appellants. Mr. Schoonover's testimony indicates that he was aware of the patent and attempted to avoid infringement by making only minimal changes while maintaining the same function. The testimony indicates that Schoonover attempted to take the DA–8 outside the claims by avoiding the "substantially tangential" language of claim 1. Schoonover drilled his ports farther off the tangent than those of Yarway's DA–4. Competent testimony indicates, as we should expect, that Schoonover's ports impart sufficient velocity, even if in a less efficient manner. Such minimal changes are those which fail to avoid infringement because of the doctrine of equivalents. We conclude that no error of law exists and that the finding of infringement is not clearly erroneous.

### Lost Profits

Following the trial, the district court determined that proper damages were to be based on the profits lost by Yarway as a result of Eur-Control's infringing sales. Appellants seek reversal of this damage award, and specifically contend that Yar-

way did not meet its burden of proving three of the four factors set forth in *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 1156, 197 USPQ 726, 729–30 (6th Cir.1978) (Markey, C.J.) and cited with approval by this court in *Central Soya Co. v. George A. Hormel & Co.*, 723 F.2d 1573, 1578, 220 USPQ 490, 494 (Fed.Cir.1983). Having considered the record in detail, however, we conclude that legally sufficient evidence did exist to support the judge's findings and, in the absence of clearly erroneous factual findings, affirm the lost profits award.

■ In general, the determination of damages under § 284 is left to the sound discretion of the trial judge and will not be disturbed absent an abuse of discretion. *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563, 219 USPQ 377, 387 (Fed.Cir.1983). Several legal principles, however, set the boundaries for the court's discretion and for this court's review. We need not repeat all these rules of law, but mention only those that guide our decision.

■ It is well settled that proof of lost profits need not be absolute but may not be speculative; lost profits must be proven to a reasonable probability. *See, e.g., Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22, 223 USPQ 591, 598 (Fed.Cir.1984); *Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 616, 222 USPQ 654, 663 (Fed.Cir.1984); *Hughes Tool Co. v. G.W. Murphy Industries, Inc.*, 491 F.2d 923, 929, 180 USPQ 353, 357 (5th Cir.1973). It is the patentee's burden therefore to prove by a preponderance that "but for" the infringement, the patent holder would have made the sales. *Bio-Rad*, 739 F.2d at 616, 222 USPQ at 663. Specifically the patentee, or here the licensee, may prove lost profits by presenting proof of (1) demand for the patented product in the market, (2) the plaintiff's ability to meet the market demand, (3) the absence of acceptable noninfringing substitutes, and (4) detailed computations of lost profits. *Central Soya*, 723 F.2d at 1578, 220 USPQ at 494 (citing *Panduit*, 575 F.2d at 1156, 197 USPQ at 729–30). Appellants

argue that there is inadequate evidence with regards to factors (2), (3), and (4). We disagree.

■ With regard to factor (3), the absence of noninfringing substitutes, we need only point to the testimony of Mr. Woodfield. The testimony indicates that devices covered by the '592 patent account for 25 percent of the total desuperheater market, but that there exists within this total market a "special niche" or a mini-market for desuperheaters covered by the '592 patent. Only Eur-Control and Yarway sell to that market. Devices sold outside the 25 percent will desuperheat steam, but are not equal or equivalent to the Gustafsson invention. Thus, this mini-market is the relevant market for purposes of determining lost profits. Appellants' argument that a mere 25 percent market share precludes a finding of no acceptable substitutes is clearly unsupported in light of this mini-market. Instead, the evidence supports the court's finding that there is no noninfringing *acceptable* substitute to meet the specific needs of this relevant market. *Cf. Central Soya*, 723 F.2d at 1579 n. 4, 220 USPQ at 494 n. 4 (finding no acceptable noninfringing substitute where other products in the market were either inferior or different). The court's reduction of the award from 100 to 85 percent, also supported by the testimony, is a reflection of the judge's determination that some buyers of desuperheaters might not be aware of Yarway and thus not purchase from it. This is a reasonable inference from the evidence as a whole.

Woodfield's testimony also provides support for the finding of factor (4), the computation of lost profits. The testimony provided the basic framework for such an award based on invoices of sales and profit figures. We cannot say that the evidence presented was legally insufficient, and therefore the infringers bear the burden of persuading this court of a clearly erroneous finding. They have not done so. The district court is free to choose the figures from which to determine the amount of damages. *Paper Converting*, 745 F.2d at 22, 223 USPQ at 599. Although the exact amount of lost profits cannot be precisely fixed, "fundamental principles of justice require us to throw the risk of any uncertainty upon the wrongdoer instead of upon the injured party." *Id.*

■ Regarding the second element, the ability to meet the market demand, appellants argue that Yarway did not prove it could meet the demand by manufacture alone should Kalle discontinue providing Yarway with the DA–4 desuperheaters. We disagree with appellants, however, and hold that the evidence as a whole does support the judge's finding that Yarway did have the ability to meet the market demand.

The record indicates several facts relevant to this issue, two of which are particularly noteworthy. First, Yarway spent a great deal of time and money developing a market for the specific desuperheater covered by the '592 patent. Yarway was aggressive in its business, both in the United States and abroad and, as evidenced by this lawsuit, was aggressive in protecting its market in these particular desuperheaters. Second, Yarway's ability to meet market demand must be considered in light of the unique relationship of Eur-Control and Kalle, as shown by the testimony of Mr. Schoonover, formerly of Eur-Control. When explaining to the court why a corporation would license a device, and then attempt to put out essentially the same product, Schoonover testified:

> Well, you really have to understand the makeup of Eur-Control. The agreement was made with Kalle as far as the desuperheater agreement was concerned. Each operating organization within [the parent], being Eur-Control U.S.A., [and the companies making up Kalle], the individual operating units *would operate as separate profit centers. Each one was obviously interested in their respective profits and operating activities.*

[Emphasis supplied.]

Schoonover's testimony is revealing: at least to some extent, Eur-Control and Kalle act separately. This evidence, when con-

sidered with the fact that the contract precludes Kalle from selling the product in the United States except to Yarway, supports the inference that Kalle would not refuse to sell Yarway the desuperheaters in the same manner as it had previously. If there were no infringing substitute, to do otherwise would be to cut off its nose to spite its face.

■ The evidence as a whole presents a picture of a desuperheater company, Yarway, aggressively acting in the market, attempting to create a demand, and meeting it. Yarway manufactures the desuperheaters whenever it is prudent; Kalle, also acting as a reasonable business entity, has filled Yarway's needs, and received its bargained-for profit in return. There is nothing in the record to indicate that had Eur-Control not infringed, this business setting would have changed. Therefore, the judge's finding that Yarway could have met the market demand is based on sufficient evidence and is not clearly erroneous. The lost profits award is affirmed.

### Enhanced Damages and Attorney's Fees

■ Eur-Control and Kalle appeal as well from the court's assessment of enhanced damages and the award of attorney's fees, under 35 U.S.C. §§ 284 and 285, respectively. Having considered the court's rationale on this issue, we must reverse the enhancement of damages and attorney's fees award.

Sections 284 and 285 provide the authority for the district court to act under its discretion, and thus we review the above-mentioned awards only for an abuse of discretion. *Rosemont, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1547–48, 221 USPQ 1, 8 (Fed.Cir.1984). For these awards to withstand appellate scrutiny, however, it is necessary that the exercise of discretion not be in conflict with the policies of the Patent Act. We find the district court's premise for its awards, that appellants acted in bad faith by attempting to invent around the patent which they had licensed, to be an inappropriate basis for the enhancement of damages.

It is well-settled that enhancement of damages must be premised on willful infringement or bad faith. *Baumstimler v. Rankin*, 677 F.2d 1061, 1073, 215 USPQ 575, 585 (5th Cir.1982); *Lam, Inc. v. Johns-Manville Corp.*, 668 F.2d 462, 474–75, 213 USPQ 1061, 1070–71 (10th Cir.), *cert. denied*, 456 U.S. 1007 (1982). Here the court specifically held that there existed no willful infringement, and thus we concern ourselves here only with the bad faith issue. We note as well that the court did not premise its award upon vexatious litigation behavior or unacceptable tactics, but upon appellants' attempt to invent around its licensed patent. The court clearly recognized this as its basis for a finding of bad faith and realized that such a premise might well not be relevant to the patent statute.

This court has indicated that the incentive to "design around" patents is a positive result of the patent system. As stated in *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236, 224 USPQ 418, 424 (Fed.Cir.1985):

> One of the benefits of a patent system is its so-called "negative incentive" to "design around" a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace. It should not be discouraged by punitive damage awards except in cases where conduct is so obnoxious as clearly to call for them.

Here appellant Eur-Control clearly attempted to invent around the patent and the court so found. While the district court may be correct in its belief that it is *fundamentally unfair* to license a company to distribute a product or to manufacture a product in this country and then through a subsidiary come in and attempt to introduce the same or basically the same item, contending that the patent authorizes some slight deviation, *see* Appendix at 789, we conclude that such behavior, when coupled with a nonfrivolous attempt to avoid infringement by changed

design, is not sufficiently "obnoxious" to countervail one of the purposes of the patent laws. Where, as in this case, the parties are working under a contract, it would be logical to expect them to provide remedies for any breach in the contract, and recourse to the more punitive aspects of tort damages is not needed. We hold that appellants' behavior in this case, that of attempting to avoid infringement and invent around a patent which they had licensed, is not of a nature sufficient to premise the enhancement of damages under 35 U.S.C. § 284. Similarly, we conclude that this cannot be deemed an exceptional case under 35 U.S.C. § 285. Accordingly, the award of attorney's fees and the enhancement of damages award are reversed.

### Counterclaims

Finally, appellants seek review of the trial court's dismissal of certain counterclaims. We affirm the court's dismissal of the Lanham Act and Georgia Deceptive Trade Practices Act claims, as we perceive no basis for such claims in the established facts.

 We conclude, however, that appellants' breach of contract counterclaim must be reconsidered. Provisions of the parties' contract clearly indicate that Yarway was to inscribe a reference to the relevant patent number as well as a reference to the license with EuroControl (Eur-Control), on all desuperheaters marketed under the license. Because there was sufficient evidence presented that Yarway did not fulfill this contractual responsibility, a breach of contract claim appears.

The district court dismissed the claim because it found that any breach by Yarway had been cured. The judge premised this conclusion upon paragraph 8(b) of the contract, which states "YARWAY or KALLE may terminate this Agreement if the other party breaches any other terms of this Agreement and fails to remedy such breach within ninety (90) days after receipt of written notice to do so;" the court concluded that Yarway did remedy its breach after proper notice.

We have no quarrel with the district court's reading of the contract and agree that Kalle could not terminate the agreement under the language of paragraph 8(b). We vacate and remand the court's dismissal of the counterclaim, however, for consideration of possible *damages* for the breach. We do so as paragraph 8(b) addresses only termination of the contract and does not appear relevant to consideration of the availability of damages for a breach. We direct the court to reconsider the claim as it relates to a claim for damages only, based upon the contract, the evidence, and the applicable law.

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.*

NIES, Circuit Judge, dissenting-in-part.

I respectfully dissent from the majority affirmance of the finding of infringement because the district court failed to make adequate findings of fact and failed to provide its interpretation of the claim in light of the prosecution history. In other respects, I join the majority.

Claim 1 of the '592 patent reads as follows:

1. A device for introducing a controlled amount of cooling water into a conduit for superheated steam, comprising a cylinder having a conical nozzle at one end, a plurality of *velocity nozzles* provided through the cylinder wall to connect the interior of the cylinder to a source of high pressure water located outside of said cylinder, said *velocity nozzles* being spaced axially and directed substantially tangentially to the cylindrical inner surface of said cylinder, a piston movable in said cylinder to progressively expose said velocity nozzles when moved backwards from a position closing said conical nozzle, said piston having a piston rod connected thereto extending through the rear end of said cylinder connected to an actuating member, the swirling water from said tangential ve-

locity nozzles passing directly through said cylinder and conical nozzle into said steam. [Emphasis added.]

The specification notes that "[a] plurality of passages through the cylinder wall are spaced axially and directed substantially tangentially. At the outside of the cylinder wall these passages communicate with a high pressure desuperheating water source."

The specification further notes that "[a] plurality of passages 15 through the cylinder wall 4, *which are in the form of velocity nozzles* are spaced axially as well as radially, preferably uniformly disposed along an imaginary helical line."

The trial court ruled from the bench as follows:

I find each and every element of claim one is present in the Gustafsson disclosure in patent '592 and in the DA-4 [sic] and in the DA-8. If there was no literal infringement, I find that the devices of the DA-4 [sic] and the DA-8 fall within the doctrine of equivalents for the reason that they perform substantially the same function in substantially the same way to achieve substantially the same result.

The trial court's written findings state as follows:

11. The DA-6 desuperheater manufactured, offered for sale and sold by defendant Eur-Control USA, comprises a central hollow cylinder forming a swirl chamber having a conical nozzle at the discharge end, from which a conical spray of water is ejected into a steam line. *A plurality of ports is provided in the wall of the cylinder which connect the interior of the cylinder with a source of high pressure water externally of the cylinder.* The ports are spaced axially of the cylinder and direct water into the cylinder tangential to the inner surface of the cylinder, causing the water to follow a swirling path toward the conical discharge nozzle. A movable piston within the cylinder progressively exposes the ports as it is moved from a closed position to control the rate of flow of water through the desuperheater.

12. The DA-8 desuperheater differs from the DA-6 desuperheater in that the ports through the cylinder wall are directed at an angle inclined toward the discharge nozzle and are moved slightly inward from the position of the ports in the DA-6 so they are not exactly tangent to the inner surface of the cylinder. The ports, however, are directed substantially tangential to the inner surface of the cylinder.

13. The DA-6 and DA-8 desuperheaters manufactured and sold by Eur-Control USA consists of a combination of elements which, as to their size, function, general shape, manner of cooperation and purpose, correspond to the parts of the desuperheater described in the '592 patent and called for by Claims 1 and 2 thereof, and the combination of such parts performs the same function in substantially the same manner to accomplish the same result as the combination of elements of the desuperheater shown and described in the '592 patent and called for by Claims 1 and 2 thereof.

14. Claims 1 and 2 of the '592 patent include within their scope desuperheaters of the DA-6 and DA-8 type manufactured and sold by Eur-Control USA. [Citations to the record omitted, emphasis added.]

The trial court's conclusion of law regarding infringement is as follows:

2. Eur-Control USA has infringed Claims 1 and 2 of United States Letters Patent 3,524,592 by the manufacture and sale of its DA-6 and DA-8 desuperheaters.

Upon Kalle's motion to reconsider the findings, the trial court's order stated as follows:

Despite defendants' arguments, the Court finds that the evidence adduced at trial does support its finding that Claims 1 and 2 of the '592 patent include within their scope desuperheaters of the DA-6 and DA-8 type manufactured and sold by Eur-Control USA. The Court recognizes the differences in structure and

performance between the '592 patent and the DA–6 and DA–8 devices but remains convinced that the DA–6 and DA–8 desuperheaters perform the same function in *substantially* the same manner as the desuperheater specified in the '592 patent.

The above statements constitute the entirety of the trial court's statements on infringement.

The trial court's succession of statements concerning infringement obfuscates the nature of its holding. It is unclear whether, after reconsideration, the trial court still finds literal infringement. Moreover, the court's various misstatements of the doctrine of equivalents test cast doubt upon the majority's conclusion that "[t]he district court was well aware of the basic rules concerning the doctrine of equivalents." Most importantly, however, the decisions below do not contain sufficient findings upon which to review the holding of infringement. Rather, we have only the conclusory statements set out above. In view of the prosecution history showing amendment from "ports" to "velocity nozzles" before the examiner would allow the claims, it cannot be assumed that Eur-Control's "ports" are the same or equivalents of "velocity nozzles." Indeed, at least *prima facie* "ports" are significantly different from "velocity nozzles."

The majority opinion interjects some evidence of its own by way of its garden hose example and then speculates about what the trial court inferred. However, the trial court itself expressed no finding concerning the relationship between the DA–6 and 8 ports and the velocity nozzles claimed. Indeed, Eur-Control asserts that no evidence was offered to establish equivalency, while Yarway points to certain testimony of its witnesses. However, following a bench trial, we are to review findings, not scrutinize the record for evidence to support inferred findings.

Because I believe the findings are deficient, I would remand for adequate findings on the infringement issue.