**DEL MAR AVIONICS, INC.,**
**Appellee/Cross–Appellant,**

v.

**QUINTON INSTRUMENT CO.,**
**Appellant/Cross–Appellee.**

Nos. 85–2443, 85–2465.

United States Court of Appeals,
Federal Circuit.

Dec. 18, 1987.

---

**1.** Given our disposition of this appeal, Williams' motion to reopen the case in the district court is moot.

Mario A. Martella, Beehler, Pavitt, Siegemund, Jagger, Martella and Dawes, Los Angeles, Cal., argued for appellee/cross-appellant. With him on the brief was Maurice B. Pilosof.

Edward W. Bulchis, Seed and Berry, Seattle, Wash., argued for appellant/cross-appellee.

Before FRIEDMAN, NEWMAN and ARCHER, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Quinton Instrument Company ("Quinton") appeals the judgment of the United States District Court for the Western District of Washington. *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, No. C78–466V (W.D.Wa. April 6, 1985). In its Findings of Fact and Conclusions of Law (Oct. 15, 1984) (hereinafter "Findings") the court held that Quinton had infringed U.S. Patent No. 3,267,934 entitled "Electrocardiac Computer", invented by William Thornton (the " '934 patent") and owned by Del Mar Avionics ("Del Mar"). A 5% royalty, which was doubled based on the court's finding of willful infringement, was awarded to Del Mar as damages. Prejudgment interest and attorney fees were also awarded.

Del Mar cross-appeals on the measure of damages.

We affirm the judgment in all respects except for the measure of damages. The damage award is vacated, and remanded for reassessment.

## Background

The Thornton invention relates to the electronic detection of heart abnormalities. The human cardiac muscle produces electrical signals, called "ECG" signals, that may be detected by electrodes on the patient's skin. The ECG signals include a group of pulses, known as the "QRS complex", that result from depolarization of the ventricles of the heart prior to contraction. Preceding the QRS complex is a small electrical pulse referred to as the "P wave", caused by the initiation of muscular activity. Following the QRS complex is another pulse called the "T wave", which is separated

from the QRS complex by the "ST segment". The Thornton invention provides automatic processing of ECG signals to detect ST segment depressions and elevations in ECG signals taken from a patient over an extended period of time. Deviation from the signal that is considered normal for the patient is an indication of certain types of heart problem.

These parties and their privies have been in litigation since 1974. The first district court decision on the '934 patent, reported at *Del Mar Engineering Laboratories v. Physio–Tronics, Inc.*, 202 USPQ 242 (C.D. Cal.1978), contains an extensive discussion of human heart function in relation to the Thornton invention. That action was brought by Del Mar against Physio–Tronics, Inc., a Quinton distributor. The California district court held the '934 patent to be valid and infringed, and enjoined Physio–Tronics from further infringement. The Ninth Circuit affirmed. *Del Mar Engineering Laboratories v. Physio–Tronics, Inc.*, 642 F.2d 1167, 209 USPQ 977 (9th Cir.1981).

A few months thereafter Quinton, the manufacturer and seller of the equipment, was included in the California district court's order of injunction, based on its "substantial involvement" in and control of the litigation. Quinton did not appeal that order.

Following its favorable decision against Physio–Tronics in the California district court Del Mar brought suit against Quinton in the District Court for the Western District of Washington, alleging infringement by the identical device adjudicated in California and requesting summary relief. Del Mar's motion for summary judgment, invoking the doctrines of res judicata and collateral estoppel, was granted. The court held that Del Mar was "entitled to recover ... those damages which plaintiff has sustained by reason of defendant's infringing acts". The accounting was "reserved for later disposition". *Del Mar Avionics v. Quinton Instrument Co.*, No. C78–466V, Slip op. at 2 (W.D.Wash. May 17, 1979). That decision was also upheld by the Ninth Circuit. *Del Mar Avionics v. Quinton Instrument Co.*, 645 F.2d 832, 213 USPQ 988 (9th Cir.1981). The appeal at bar arises from the reserved accounting proceeding in the Washington action.

Meanwhile, Quinton was selling a similar device in California, and Del Mar brought a contempt proceeding. At an evidentiary hearing the equipment at issue was found to contain modified circuitry. The device that was initially before the California court was later denominated a "type A" S–T segment computer, and the modified circuitry was called "type C". The California district court held that the type C circuitry did not infringe the '934 patent. *Del Mar Engineering Laboratories v. Physio–Tronics, Inc.*, No. CV74–3008–JWC (C.D. Cal. March 24, 1980). That ruling was affirmed on appeal. *Del Mar Engineering Laboratories v. Physio–Tronics, Inc.*, 222 USPQ 793, 673 F.2d 1337 (9th Cir.1982).

During discovery pertinent to the accounting for the type A device in the Washington action, Del Mar learned that Quinton was also selling a third form of the device, having circuitry called "type B". Del Mar charged that this circuitry also infringed the Thornton patent. In August 1983 an evidentiary hearing was held by the Washington district court on the issues of (1) infringement by the type B circuitry, and (2) damages as to type A and, if appropriate, type B. The district court found that type B infringed the Thornton claims, determined which Quinton models embodied the types A and B infringing circuitry, in distinction from the excluded type C models, and assessed damages.

### Effect of Prior Litigation

■ The prior determination of certain issues, including the issues of claim construction and of infringement by the type A and non-infringement by the type C models, bars judicial redetermination of those issues as between the parties to the prior actions. As described by the doctrine of "issue preclusion", the relitigation of issues previously decided is barred on principles of finality and repose. 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice & Procedure* § 4402 at 10 (1981 ed.). *See*

*Commissioner v. Sunnen,* 333 U.S. 591, 601, 68 S.Ct. 715, 721, 92 L.Ed. 898 (1948):

> Of course, where a question of fact essential to the judgment is actually litigated and determined in the first ... proceeding, the parties are bound by that determination in a subsequent proceeding even though the cause of action is different.

*See also Messenger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912); *Stewart–Warner v. City of Pontiac, Michigan,* 767 F.2d 1563, 1568, 226 USPQ 676, 679 (Fed.Cir.1985).

■ Res judicata is of the same effect with respect to a final decision between the parties as to the identical dispute. As the Court stated in *Cromwell v. County of Sac,* 94 U.S. (4 Otto) 351, 353, 24 L.Ed. 195 (1876):

> But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.

Quinton argues that the Washington district court clearly erred in finding infringement by type B. Quinton states that even if type B is "not exactly" the same as type C and thus not a beneficiary of the principles of res judicata, the B and C circuits have sufficient similarity to bar Del Mar's claim of infringement by type B. Del Mar asserts the contrary conclusion, based on the district court's finding of the similarity between types A and B. Thus each side asserts that there are benefits, available only to it, of the prior adjudications on types A and C.

■ The district court found that type B was not identical to either type A or type C. On this basis the district court correctly held that absent a prior determination of infringement with respect to type B, neither res judicata nor issue preclusion applied. A device not previously before the court, and shown to differ from those structures previously litigated, requires determination on its own facts.

■ Quinton argues that type B "could have been litigated in the California contempt proceeding", implying that failure to have done so insulates type B from further scrutiny. However, Quinton does not also allege that the existence of the type B model was known to Del Mar or was brought to the California court's attention; indeed, Del Mar asserts that type B was within the scope of its discovery request but was not produced. The Court stated in *Cromwell,* 94 U.S. (4 otto) at 356:

> On principle, a point not in litigation in one action cannot be received as conclusively settled in any subsequent action upon a different cause, because it might have been determined in the first action.

On this basis, infringement by type B was properly before the Washington district court.

In determining whether the type B device infringed the '934 patent claims, the district court applied the law of the case to the issues of claim interpretation and construction, as developed in connection with types A and C and as affirmed by the Ninth Circuit.

■ Claim construction is a question of law that may require determination of underlying facts. *Mannesmann Demag Corp. v. Engineered Metal Products Co.,* 793 F.2d 1279, 1282, 230 USPQ 45, 46 (Fed. Cir.1986). To the extent that the underlying facts are based on identical premises, as is here the case, the prior findings and the claim construction based thereon are the law of the case. They are not available for redetermination.

Quinton's argument that the district court failed to construe the '934 claims in a manner consistent with the specification and as comprehended by one of ordinary skill in the art must be viewed in relation to the prior claim construction. We have reviewed the arguments, but we have been shown no error in the Washington district court's construction of the '934 claims in accord with that of the prior adjudications.

### Infringement

■ Quinton states that it does not dispute the preclusive effect of the claim con-

struction applied by the California court. Rather, Quinton argues that the Washington district court could not have defined the "sampling means" in the same way as did the California court, because if it had done so it could not have correctly found that the type B circuit infringes the Thornton claims.

The Washington district court made extensive Findings of Fact showing its analysis of the type B circuit in light of the Thornton invention. The court referred to the California holding that the type C circuit was not encompassed by the '934 claims because type C provided an absolute value for the ST segment, rather than a relative value obtained by comparing samples, as in the '934 disclosure and as embodied in type A. All other aspects of the devices and the '934 claims being the same, the court focused on this aspect as the basis for its conclusion that the '934 claims were infringed by type B.

The court found that in both type A and type B the delayed ECG wave form was shifted downward so that the PQ segment of the wave form was always at or near zero volts. The court found that the differential amplifier performed the same function in the same way in both the type A and type B circuits; whereas in type C, although the function was the same, one input to the differential amplifier was at zero voltage because it was grounded, not because it compared the outputs of the PQ and ST capacitors.

The district court concluded that "both the 'A' and 'B' forms of circuitry operated in substantially the same manner, by substantially the same means, to accomplish the same results as the equipment described and claimed in the Thornton patent."

Although Quinton alleges that the accused device was not compared to the claims, it has not shown reversible error on this point. The claims are in the so-called "means-plus-function" form of 35 U.S.C. § 112 ¶ 6, and the Findings show consideration by the court of the means that is described in the specification as performing the claimed function. There was testimony

on the structure of the device as described in the '934 patent and as embodied in the various accused models. The court's discussion of the comparison among types A, B, and C and not improper, but provides the technological explanation of the court's finding of infringement by type B.

Quinton has not carried the burden of its argument, invoking the "reverse doctrine of equivalents", that even if the claims literally read on the accused device it has been so changed that it is no longer the same invention, see *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

■ Quinton also asserts that the district court erred in failing to construe the patent terms in accordance with the testimony of Quinton's patent expert. A district court is not obliged to adopt a conclusion stated by an expert witness, *see, e.g., Minnesota Mining & Mfg. Co. v. Berwick Industries, Inc.*, 532 F.2d 330, 333, 190 USPQ 209, 211 (3d Cir.1976) ("it is axiomatic that the trier of fact is not bound to accept expert opinion, even if it is uncontradicted"), although in the case before us the court remarked that the expert testimony concerning the operation of the Thornton device was "generally correct and accurate" and in accord with the pertinent findings in the California proceeding. The court's obligation is to weigh expert and other testimony; but it is the court's, not the expert's, responsibility to decide the case.

Quinton also argues that the district court's findings are internally inconsistent, and that the court's findings and conclusions are inadequate in terms of Fed.R.Civ. P. 52(a), citing *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1374–75, 231 USPQ 81, 86–87 (Fed.Cir.1986). In *Hybritech* the district court had adopted verbatim a party's pretrial findings of fact and conclusions of law, a procedure that this court held did not of itself constitute reversible error. No such circumstance is here present. The district court's decision and order is sufficiently detailed and is to the point; the issues resolved in prior liti-

gation between the same parties did not require reanalysis or recitation; and no clear inconsistency has been shown.

The district court's determination that the type B device infringes the '934 patent claims is not clearly erroneous, and is affirmed.

### Damages

The district court stated that it was unable to determine Del Mar's lost profits:

> Although there can be no doubt that plaintiff lost sales of its own ST segment computer because defendant was offering and selling its competing device, the Court is unable to determine by a preponderance of the evidence either the number of sales which were probably lost by plaintiff by reason of defendant's infringing sales or the loss in net profits suffered by plaintiff by reason of those lost sales. Both the loss in sales and the loss of net profits depend upon so many variables and so many indeterminate factors that the Court finds that it is unable to award damages to plaintiff based upon the net profits allegedly lost by it.

Therefore, the court concluded, "the most appropriate basis for the award of damages" was a royalty at the rate of 5% of the gross selling price of Quinton's infringing S–T segment computer.

The court set the royalty at that which it concluded would have been acceptable to a prudent and willing licensor and licensee, although the court found that Del Mar was not a willing licensor:

> Plaintiff was not in the practice of licensing its ST segment computer to anyone else and would not voluntarily have licensed. Its desire and intent was to be the exclusive producer and seller of the ST segment computer. Given a choice it would have greatly preferred to retain its patent monopoly on its ST segment computer.

Del Mar asserts that the district court erred in not awarding damages measured by its lost profits, which Del Mar argues had been demonstrated adequately and accurately.

The statutory instruction for awarding damages for patent infringement is that the award must be "adequate to compensate for the infringement". 35 U.S.C. § 284. The Supreme Court discussed compliance with this standard in *Aro Manufacturing Co. v. Convertible Top Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed. 2d 457 (1964):

> The question to be asked in determining damages is "how much had the Patent Holder and Licensee suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder–Licensee have made?" *Livesay Window Co. v. Livesay Industries, Inc.*, 251 F.2d 469, 471 (5th Cir.1958).
>
> Thus, to determine the damages that may be recovered from Aro here, we must ask how much CTR suffered by Aro's infringement—how much it would have made if Aro had not infringed.

The general rule for determining the actual damages to a patentee that is itself producing the patented item, is to determine the sales and profits lost to the patentee because of the infringement. Although the statute states that the damage award shall not be "less than a reasonable royalty", 35 U.S.C. § 284, the purpose of this alternative is not to provide a simple accounting method, but to set a floor below which the courts are not authorized to go. *Seattle Box Co. v. Industrial Crating & Packing Inc.*, 756 F.2d 1574, 1581, 225 USPQ 357, 363 (Fed.Cir.1985).

In order to recover lost profits a patentee must show a reasonable probability that, but for the infringement, it would have made the sales that were made by the infringer. Del Mar presented evidence, generally uncontroverted, showing the demand for the product, the absence of acceptable noninfringing substitutes, and its ability to meet the demand. The patentee is not obliged to negate every possibility that a purchaser might not have bought the patentee's product instead of the infringing one, or might have foregone the purchase altogether. *Paper Converting Machine Co. v. Magna–Graphics*

*Corp.*, 745 F.2d 11, 21, 223 USPQ 591, 598 (Fed.Cir.1984). The patent owner's burden of proof is not an absolute one, *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065, 219 USPQ 670, 675 (Fed.Cir.1983), although liability does not extend to speculative profits. *Yarway Corp. v. Eur–Control USA, Inc.*, 775 F.2d 268, 275, 227 USPQ 352, 357 (Fed.Cir.1985); *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 616, 222 USPQ 654, 664 (Fed.Cir.1984).

 When the patent owner and infringers were the only suppliers of the patented product, it is reasonable to infer that the patent owner would have made the sales made by the infringers. *Lam, Inc.*, 718 F.2d at 1065, 219 USPQ at 675. In its brief, Del Mar estimates its pro rata share of Quinton's sales based on the one or two (depending on the year) other suppliers who were also accused infringers. When the amount of the damages is not ascertainable with precision, reasonable doubt is appropriately resolved against the infringer. *Id.*

 The requirement to determine actual damages is not diminished by difficulty of determination. Although some calculations in some cases might present undue obstacles, we agree with Del Mar that such is not here the case. For example, the district court's Finding 42 as to the number and selling price of the accused models is not challenged by Quinton:

42. The following number of units of the Type A and B circuits were manufactured by defendant in the year indicated:

| Year | Model 730 | Model 740 | Model 741 |
|------|-----------|-----------|-----------|
| 1974 | 36 | 19 | – |
| 1975 | 59 | 46 | – |
| 1976 | 66 | 50 | – |
| 1977 | 50 | 21 | 35 |
| 1978 | 55 | 8 | 101 |

 The determination of a damage award is not an exact science, *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 863, 226 USPQ 402, 409 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986), and "the amount need not be proven with unerring precision." *Bio–Rad Laboratories*, 739 F.2d at 616, 222 USPQ at 663–64. The trial court is required to approximate, if necessary, the amount to which the patent owner is entitled. "In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

 Del Mar argues that computation of its lost profits should be based on the entire market value of the stress test machine, explaining that the ST segment computer was sold by it as an option that could only be used in the Del Mar stress test equipment that was built to hold it. Del Mar thus argues that it also lost sales (and profits) on its stress test line. We have held that in appropriate circumstances the patentee may prove the extent of its lost profits by the "entire market value rule", *Paper Converting Machine*, 745 F.2d at 22–23, 223 USPQ at 599, based on a showing that the patentee could reasonably anticipate the sale of the unpatented components together with the patented components. *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 656, 225 USPQ 985, 989 (Fed.Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985); *Tektronix, Inc. v. United States*, 552 F.2d 343, 351, 213 Ct.Cl. 257, 193 USPQ 385, 393 (1977), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978). Other factors, such as development costs and business risks, may be taken into account if the circumstances warrant. *Bendix Corp. v. United States*, 676 F.2d 606, 615, 230 Ct.Cl. 247 (1982). Del Mar also offered a computation of its lost profits using an incremental income analysis such as was recognized in *Paper Converting Machine Co.*, 745 F.2d at 22, 223 USPQ at 599. Although it appears that Quinton presented opposing evidence and argument on these points, the district court made no express findings thereon. Upon remand, it will be appropriate for the court to consider all factors reasonably pertinent to a determination of damages that bear a reasonable

relationship to the damages actually suffered by the patent owner.

Del Mar states that the 5% royalty is not only an inappropriate measure of actual damages, but that if damages are to be measured by a royalty, a higher rate is required. Del Mar states that it presented evidence of an actual royalty of $400 per unit, paid for a similar optional component, between a willing licensor and licensee; this figure, substantially higher than that adopted by the court, appears to have been the only evidence of royalty practices in the industry.

The approach taken by the district court is suited to circumstances where there is an established royalty or licensing program, or if the patentee is not itself in the business, or if profits are too speculative to estimate. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078, 219 USPQ 679, 682 (Fed.Cir.1983). None of those situations here prevailed.

The principle underlying damage measurement is unchanged even when there is an established royalty, for it is reasonable to assume that this royalty is a fair measure of the actual damage to a patentee who has authorized others to practice the patented invention. In this case, we have been directed to no evidence of record in support of the 5% royalty here assessed. It was not an established royalty, and was not found by the district court or shown by Quinton to be an approximation of the damages actually sustained. Its imposition on a patent owner who would not have licensed his invention for this royalty is a form of compulsory license, against the will and interest of the person wronged, in favor of the wrongdoer. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (quoting *Wicker v. Hoppock*, 73 U.S. (6 Wall.) 94, 99, 18 L.Ed. 752 (1867)):

> [t]he general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have

occupied if the wrong had not been committed.

We conclude that the district court erred in assessing damages, in the circumstances here shown, because, as the court stated, it gave controlling weight to the difficulty of the calculation, and in so doing adopted a measure of damages that was not designed to make whole the injured party.

We vacate the damages measured as a 5% royalty, and remand for determination of damages based on the patentee's lost profits.

### Willful Infringement and Enhanced Damages

 The district court found that from Del Mar's first notice of infringement to its third notice letter more than five months later, Quinton did not consult an attorney regarding the charge. The court found that before Del Mar's suit Quinton did not procure a patent search, and that Quinton continued to manufacture and sell infringing devices even after commencement of suit. The court held that Quinton had "acted in wilful and conscious disregard of [Del Mar's] rights", and doubled the damages.

Del Mar contends that the district court insufficiently multiplied damages as authorized in 35 U.S.C. § 284, and that anything less than a trebled damage award constitutes an abuse of the court's discretion in view of Quinton's actions. Quinton argues that the district court was clearly in error in even doubling the damage award because "Quinton was advised by the patent counsel that the claims of the patent were either invalid and/or not infringed" after suit was filed, and because the presidents of Del Mar and Quinton met prior to the filing of suit in an attempt to resolve the issue.

In *Kori Corp.*, 761 F.2d at 656–57, 225 USPQ at 989–90, the finding of willful infringement was based on the defendant's failure to establish good faith reliance on an authoritative opinion of invalidity before starting to manufacture the infringing units. This court saw no abuse of discretion in the doubling of that damage award.

As we discussed in *Rite–Hite Corp. v. Kelley Co., Inc.,* 819 F.2d 1120, 1125, 2 USPQ2d 1915, 1918 (Fed.Cir.1987), "[t]he weight that may fairly be placed on the presence or absence of an exculpatory opinion of counsel has varied with the circumstances of each case, and has not been amenable to development of a rigorous rule."

Neither Quinton nor Del Mar has shown that the district court abused its discretion in doubling the damage award. A trial court's exercise of discretion in such circumstances is "informed by the court's familiarity with the matter in litigation and the interest of justice." *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.,* 781 F.2d 198, 201, 228 USPQ 367, 369 (Fed.Cir.1986).

No clear error in the finding of willful infringement has been shown. The doubling of damages, and the refusal to triple them, are not unreasonable in the circumstances shown, and are sustained.

### Attorney Fees and Costs

██ Holding that this was an exceptional case in terms of 35 U.S.C. § 285, the court awarded attorney fees and costs to Del Mar.

The finding of willful infringement is legally sufficient to meet the criterion of "exceptional case", and in such case it is within the court's discretionary authority to award attorney fees. That discretion has not been shown to have been abused, and accordingly the award is affirmed.

### Summary

The judgment is affirmed with respect to infringement by type "B", doubling of damages, and the assessment of attorney fees and costs. We vacate the measure of damages, and remand for determination of damages on the basis of Del Mar's lost profits.

AFFIRMED IN PART, VACATED IN PART and REMANDED.